Emil M. Forster and Miriam W. Forster v. Commissioner.
Forster v. Commissioner
Docket Nos. 73953, 84381.
United States Tax Court
T.C. Memo 1961-281; 1961 Tax Ct. Memo LEXIS 67; 20 T.C.M. (CCH) 1488; T.C.M. (RIA) 61281; October 9, 1961
*67 Emil M. Forster, pro se, Colin C. Macdonald, Jr., Esq., and Samuel T. Reiner, Esq., for the respondent. RAUM
Memorandum Opinion RAUM, Judge: Emil M. and Miriam W. Forster, husband and wife, filed their joint Federal income tax returns for the years in controversy in New York, where they reside. Emil will sometimes hereinafter be referred to as petitioner. The Commissioner determined deficiencies in income tax against petitioners as follows: Additions to Tax, I.R.C. 1939
Sec. 294
Year
Deficiency
Sec. 293(b)
(d)(2)
1950
$145,018.86
$ 72,532.43
$8,670.89
1951
4,151.34
2,075.67
1952
304,132.62
152,066.31
1954
919.65
The notice of deficiency for the years 1950-1952 was sent on September 22, 1959, and the deficiencies for those years are barred unless the Commissioner establishes fraud. No statute of limitations issue is involved for the year 1954, the deficiency notice with respect to that year having been sent on March 20, 1958. Petitioner was in the business of manufacturing and selling toys. He conducted that business together with his father, Leon Forster, through the medium of a corporation, Joy Toys, Inc. *68 , in which they owned all the stock. They were also equal partners in a related venture known as Joy Export Company, which sold toys in Cuba and other countries; that company was incorporated in 1952, and petitioner and his father became the sole stockholders. The principal items in controversy are so-called unexplained deposits in a personal bank account of petitioner in the amounts of $227,779.22 and $15,568.14 for the years 1950 and 1951, respectively, and $356,484.93 for the year 1952 representing alleged withdrawals by petitioner from the corporations. The evidence shows that petitioner's enterprises were sustaining large losses in Cuba and that petitioner, in an effort to keep the business afloat, commenced kiting checks in 1950. These check-kiting operations, which were highly complicated and not entirely clear to us, continued until well into 1952, when matters came to a head with the disclosure of the hopeless insolvency of the toy business, the fictitious nature of various accounts which had been factored, and the related check-kiting activities. Petitioner was subsequently indicted for criminal acts in connection with these activities. He pleaded guilty and was given *69 a suspended sentence. The evidence further shows that during the period in question petitioner and his father mortgaged personal residences owned by them to provide security for funds borrowed on behalf of the toy business in furtherance of the effort to save the business. Those properties were subsequently lost on foreclosure, although there is some evidence of cloudy import to the effect that certain relatives of petitioner may have acquired an interest therein. We are satisfied on the record that at least the great bulk of the so-called unexplained bank deposits in 1950 and 1951 and the corporate withdrawals in 1952 were merely parts of the elaborate check-kiting operations and did not in fact represent income to petitioner. These operations were conducted through a number of accounts, including petitioner's personal account, and we are convinced by the evidence that the deposits in his personal account were merely part of the movement of funds in a circle. Similarly, the 1952 corporate withdrawals were simply further steps in the check-kiting merry-go-round. Such funds, only temporarily within petitioner's possession as part of the check-kiting circle, do not represent income *70 to him, and the situation is to be sharply distinguished from the one where the wrongdoer is actually enriched by illegally obtained funds. Cf. . The evidence persuades us that petitioner realized no such extraordinary amounts of income as have been attributed to him by the Commissioner with respect to these items. If the years were not barred, we could probably find that comparatively small portions of the disputed items were retained by petitioner to cover living expenses, shown to have been on a modest scale, and we would probably conclude that such portions represented taxable income to him. However, we cannot find on this record that the failure to report such amounts was due to fraud with intent to evade tax. Fraud must be proved by "clear and convincing" evidence, and although we do not rule out the possibility of fraud, we are fully satisfied that it has not been proved by the required clear and convincing evidence in relation to these items. Nor can we find fraud with respect to any of the other component items upon which the deficiencies were based. Thus, items of unreported partnership income ascribed to petitioner in *71 the amounts of $5,000 and $3,378.61 for the years 1950 and 1952, respectively, probably would have to be decided against petitioner for failure of proof if limitations were not a bar. But petitioner's failure of proof is not sufficient to carry the Government's burden with respect to fraud, and we do not have any persuasive evidence that petitioner fraudulently failed to report these amounts as income. Similarly, we think that no such convincing evidence of fraud was presented in respect of the remaining items upon which the deficiencies were based. It is not necessary for us to recount the evidence or to describe such items, which are set forth in the Commissioner's answer. Suffice it to say that we cannot find on this record that any part of any deficiency for the years 1950 through 1952 was due to fraud with intent to evade tax. Accordingly, we hold that those years are barred. The $919.65 deficiency for 1954 was based entirely upon the disallowance in toto of the following deductions claimed on petitioner's 1954 return: (a) Contributions
$ 343.75
(b) Interest
830.61
(c) Miscellaneous taxes
267.45
(d) Medical expense
930.88
(e) Miscellaneous expenses
2,125.16
(f) Capital loss
1,000.00
*72 Lack of substantiation was assigned as the reason for disallowance, and, since such deductions constituted all of the deductions claimed on the return, the Commissioner allowed instead the standard deduction, computed to be $838.71. The burden of proof with respect to these items was of course upon petitioners. Emil M. Forster testified as to each of them and submitted a considerable amount of documentary evidence in support of his testimony. We are satisfied on the evidence and find as facts that petitioners made charitable contributions in 1954 in the amount of $343.75; [1] that they paid interest in the amount of at least $830.61 in 1954 upon insurance loans, bank loans, and other loans; that they incurred medical expenses in 1954 in the amount claimed by them on their 1954 return; that petitioner actually paid the $2,125.16 in miscellaneous expenses in 1954 consisting of commissions paid to other agents and expenses for extensive travel plus some entertainment in relation to his business of selling toys during that year; and that he sustained a capital loss in excess of $6,000 in 1953 with respect to two toy companies that he attempted to organize during 1953 and which became *73 defunct prior to the close of that year with the consequence that he became entitled to a carryover of that loss in the amount of $1,000 to the year 1954. However, the evidence does not support the deduction for miscellaneous taxes in the amount of $267.45. The evidence shows that this item is composed in part of nondeductible social security taxes for domestic help and Federal taxes on transportation. Another component of some $172 for sales taxes appears to us to be too high on this record, and we find as a fact that petitioners paid deductible miscellaneous taxes in the amount of $125 during 1954. Decision will be entered *74 under Rule 50 in Docket No. 73953; Decision will be entered for the petitioners in Docket No. 84381. Footnotes
1. Cancelled checks in support of most of these contributions as well as some of the other deductions were drawn upon an account of Jay Toy & Doll Corp., a corporation controlled by petitioners in 1954. However, it seems clear that the payments were made on behalf of petitioners as individuals, and that these checks simply represented withdrawals by them from the corporation for their personal purposes. Whether such withdrawals could result in offsetting income adjustments against them in the nature of dividends is a possible issue that is not before us.↩